Malvika A. Sinha (AZ Bar No. 038046)
Kelleen Mull (AZ Bar No. 036517)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
Tel.: (602) 381-5472
msinha@cblawyers.com
kmull@cblawyers.com

Michael T. Renaud (Admitted *pro hac vice*)
Adam S. Rizk (Admitted *pro hac vice*)
Thomas H. Wintner (Admitted *pro hac vice*)
Matthew C. Hurley (Admitted *pro hac vice*)
Matthew A. Karambelas (Admitted *pro hac vice*)
James J. Thomson (Admitted *pro hac vice*)
Samuel J. Lyons (Admitted *pro hac vice*)
**MINTZ, LEVIN, COHN, FERRIS,
    GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, Massachusetts 02111
Tel.: (617) 542-6000

*Counsel for Plaintiff
JUUL Labs, Inc.*

## UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| JUUL Labs, Inc., | Case No. 2:25-cv-02853-JJT |
| Plaintiff, | **PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| v. | |
| NJOY, LLC, NJOY Holdings, Inc., Altria Group, Inc., Altria Group Distribution Company, and Altria Client Services LLC, | |
| Defendants. | |

## I.    INTRODUCTION

In its opening claim construction brief, NJOY impermissibly seeks to conflate the issues of claim construction and infringement. In so doing, NJOY proposes constructions that ignore the teachings of the patent at issue and the state of the art at the time of the invention. Both of NJOY's proposed, alleged "plain and ordinary meaning" constructions should be rejected.

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

## II.    BACKGROUND

While JLI believes that the claim terms in dispute can and should be resolved based on the intrinsic patent record only, to the extent extrinsic evidence is considered, a brief background is presented below on (a) terminology relating to the electronic cigarette industry, and (b) measurement techniques for ionized nicotine.

### A.    Electronic Cigarettes and Cartridges

Electronic cigarettes were first introduced into the United States in 2006. Since that time, the terminology used to describe various embodiments and features of such devices has varied throughout the industry. *See generally* Jenny E. Ozga et al., *Electronic Cigarette Terminology: Where Does One Generation End and the Next Begin?*, 24 Nicotine & Tobacco Res. 421 (2022), attached hereto as Ex. 1. Researchers have generally settled on four "generations" of electronic nicotine delivery systems (ENDS). *See id.* The first generation ENDS products are also known as "cigalikes," due to their resemblance to a traditional cigarette. *Id.* Cigalikes are single-use products not intended to be refilled or charged. As the generations progressed, the form factor, customizability, electronics, and other features of ENDS products changed, eventually arriving at the JUUL-style products in the fourth generation. *See*, *e.g.*, Aruni Bhatnagar et al., *Electronic Cigarettes*, 130 Circulation 1418, 1419 (2014), attached hereto as Ex. 2 ("Regardless of type, there are 3 basic e-cigarette components: a battery, an e-liquid–containing cartridge, and an atomizer (ie, a vaporization chamber with heating element)."); Neal L. Benowitz, *Emerging Nicotine Delivery Products*, 11 Ann. Am. Thorac. Soc. 231, 233 (2014), attached hereto as Ex. 3 ("E-cigarettes consist of a cartridge containing a liquid (propylene glycol, sometimes combined with glycerine, nicotine, and flavorings), a heating element, a lithium battery, and a microchip. Some devices look like conventional cigarettes and are disposable; others resemble pens or cigars and have replaceable or refillable tanks.").

This understanding is reflected in the patent literature, including patents cited on the face of the '533 patent. For example, United States Patent Publication No. 2013/0081642 ("Cartomizer E-Cigarette") describes in the background of the invention:

PLAINTIFF'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

[0006] E-cigarettes are portable, self-contained cylindrical devices the size of which depends upon battery capacity. E-cigarettes have been designed to resemble actual cigarettes, cigars or even pipes. Some e-cigarettes are reusable, with replaceable and refillable parts; others are disposable.

[0007] E-cigarettes share three essential components. A "cartridge" serves as a mouthpiece and usually doubles as a small reservoir that holds the liquid that is to be vaporized. An atomizer serves as the heating element responsible for vaporizing the liquid to provide the aerosol mist. A battery unit serves as a battery supply in portable e-cigarette models. Other electronic components necessary for e-cigarette operation are housed within the battery unit.

Defendant Altria's own patent disclosures also reflect this understanding:

[0027] In the preferred embodiment, once the liquid of the cartridge is spent, only the first section **70** is replaced. An alternate arrangement includes a layout where the entire article **60** is disposed once the liquid supply is depleted. In such case the battery type and other features might be engineered for simplicity and cost-effectiveness, but generally embodies the same concepts as in the preferred embodiment in which the second section is reused and/or recharged.

US Pat. Publ. No. 2013/0,192,615 ("Electronic Cigarette") at [0027]. Moreover, Defendant NJOY similarly used the term "cartridge" in the single-use ENDS context:

[0004] In accordance with an embodiment of the present invention, a single-use electronic cigar is disclosed. The electronic cigar comprises: a cylindrical case adapted to contain internal components, wherein the internal components comprise: a cartridge containing liquid having nicotine; a heating member coupled to the cartridge for vaporizing the liquid; a printed circuit board coupled to the heating member; a power source coupled to the printed circuit board; and a reed switch coupled to the power source; a mouthpiece coupled to one end of the cylindrical case wherein the mouthpiece mimics the end of a conventional cigar that contacts a mouth of a user; a lit tip end coupled to another end of the cylindrical case, wherein the lit tip end mimics the end of a conventional cigar that is burned; and a sheath coupled to the mouthpiece and to at least a portion of an external portion of the cylindrical case.

WO 2013/142,678 ("Single-use Electronic Cigar") at [0004]. *See also* WO 2013/141,906 ("Electronic Cigarette Having a Flexible and Soft Configuration") at [0017] ("The device … is provided as a one- piece assembly (i.e., with battery and cartridge both contained

3

within a single housing) and may be disposable after the expiration of the battery or cartridge.").

Thus, the definition of "cartridge" in an electronic cigarette has varied depending on device and context.

**B.    Measurement of Nicotine and Acid Ion Fractions in E-Liquids**

pH testing combined with the Henderson-Hasselbalch equation to determine the degree of ionization of nicotine (or the degree of ionization of a counterion, such as an organic acid) has been a commonly used and reliable technique for regulatory agencies (such as the FDA and CDC), academic researchers, and private industry—both before and after the earliest priority date of the '533 patent. *See*, *e.g.*, *Revised Protocol for Analysis of Nicotine, Total Moisture, and pH in Smokeless Tobacco Products*, 74 Fed. Reg. 712 (Jan. 7, 2009), at 716-17 (CDC relying on pH and Henderson-Hasselbalch for calculating protonated nicotine concentrations in smokeless tobacco); Bourgart et al., *Toward Better Characterization of a Free-Base Nicotine Fraction in e-Liquids and Aerosols*, 35 Chem. Res. Toxicol. 1234, 1237 (2022), attached hereto as Ex. 4 ("Results demonstrated a high repeatability of pH measurements, with limited standard deviation. Accuracy was verified by a comparison of values with the literature."); Gholap et al., *An Analytical Perspective on Determination of Free Base Nicotine in E-Liquids*, J. Anal. Meth. Chem. (2020), at 9, attached hereto as Ex. 5 (same).

Indeed, the pH/Henderson-Hasselbalch technique has been relied on by NJOY's expert as a "standard equation" "well-known in the field" in a recent IPR proceeding involving the '533 patent—where, notably, NJOY did ***not*** seek any construction of the same term it proposes for construction here. *See*, *e.g.*, *NJOY LLC et al. v. Juul Labs, Inc.*, IPR2026-00161, Ex. 1009 at ¶ 47 (Declaration of NJOY/Altria's expert Dr. Stephen Byrn, relying on pH and the Henderson-Hasselbalch equation to calculate protonated nicotine concentrations). The same technique has also been relied on by defendant Altria in premarket tobacco submissions to the FDA. *See*, *e.g.*, Ex. 6, NJOYITC00434469 (Altria scientist stating: "From this paper exercise, ***I don't see a need to do any NMR studies.***

1  **CTP [Center for Tobacco Products] relied on the Henderson-Hasselbalch equation**
2  **when calculating free base nicotine**.") (emphasis added).

3    In contrast, NMR testing of nicotine for measurement of ionization state is a
4  relatively new development, first being described in a 2018 publication, more than 5 years
5  **after** the priority date of the '533 patent. *See* Duell et al., *Free-Base Nicotine Determination*
6  *in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, Chem. Rsch. in Toxicology
7  (2018), attached hereto as Ex. 7. The NMR method has neither replaced nor been deemed
8  more reliable than the pH method. *See* Ex. 5, Gholap et al.; Ex.4, Bourgart et al. at 1241.

9  **III.    LEGAL STANDARDS**

10    **A.    Expert Witness Testimony**

11    "Patents should be interpreted on the basis of their intrinsic record, not on the
12  testimony of such after-the-fact 'experts' that played no part in the creation and prosecution
13  of the patent." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706
14  (Fed. Cir. 1997) "Any other rule would be unfair to competitors who must be able to rely
15  on the patent documents themselves, without consideration of expert opinion that then does
16  not even exist, in ascertaining the scope of a patentee's right to exclude." *Southwall Techs.,*
17  *Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995). Thus, expert witness
18  testimony should be afforded little if any weight in the claim construction inquiry.

19    **B.    Indefiniteness**

20    A party asserting indefiniteness of a patent must prove it by clear and convincing
21  evidence. *Nautilus,* 572 U.S. at 912 n.10. As the Federal Circuit has explained: "Under our
22  post-*Nautilus* cases, a claim is not indefinite if a person of skill in the art would know how
23  to utilize a standard measurement method … to make the necessary measurement. A patent
24  need not explicitly include information that is already well known in the art." *Presidio*
25  *Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017).
26  Relatedly, the Federal Circuit has held that the "mere possibility of different results
27  from different measurement techniques" does not render a claim indefinite. *Takeda Pharm.*
28  *Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1366-67 (Fed. Cir. 2014).

PLAINTIFF'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

Indefiniteness is evaluated from the perspective of a person of skill in the art and how that person would understand the scope of the claim when it is read in light of the specification. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986). The evaluation is conducted in light of knowledge extant in the art at the time the patent application was filed. *See W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556-57 (Fed. Cir. 1983); *see also Honeywell Int'l v. Int'l Trade Comm'n*, 341 F.3d 1332, 1336 (Fed. Cir. 2003) (conducting the indefiniteness inquiry using only measurement methods "published in the art as of the earliest priority date of the [asserted] patent.").

## IV.   NJOY'S PROFFERED EXPERT REPORTS SHOULD BE AFFORDED NO WEIGHT IN THE CLAIM CONSTRUCTION ANALYSIS HERE

Expert testimony is heavily disfavored in the claim construction process due to the risk of bias. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (noting that "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence," and that "[t]he effect of that bias can be exacerbated if the expert is not one of skill in the relevant art or if the expert's opinion is offered in a form that is not subject to cross-examination") (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, (1993)). In its opening brief, however, NJOY relies heavily on two excerpted expert reports rather than the intrinsic evidence of the patent. The bias of NJOY's experts is on full display when they purport to offer testimony about nicotine ionization measurement techniques and yet fail to link that testimony to the state of the art at the time of invention. The claim construction issues raised here can be fully resolved by the intrinsic evidence of the patent, and the Court need not—and indeed should not—resort to expert testimony.[1]

---

[1] Should the Court elect to hear expert testimony or have technical questions answered as part of the claim construction process (which JLI maintains is not necessary), JLI offers Dr. Mansoor Amiji, Distinguished Professor in Pharmaceutical Sciences and Chemical Engineering at Northeastern University, to present live testimony about techniques for analyzing ionized nicotine. Dr. Amiji has already offered opinions on this topic in his infringement report in the parallel ITC case, and he has already offered opinions rebutting the expert testimony that NJOY improperly offers here.

PLAINTIFF'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

1

2

**V.    NJOY'S MANIPULATION OF THE PLAIN LANGUAGE OF THE DISPUTED TERMS SHOULD BE REJECTED**

3

**A.    "cartridge"**

4

NJOY's proposed construction of this term is a textbook example of an attempt to

5

import a limitation into the claims. NJOY's brief admits:

6

> The '533 patent recites "an electronic cigarette comprising a cartridge" and that the cartridge "comprises a nicotine salt liquid formulation." '533 patent, cl. 1. The claim therefore refers to the "cartridge" as a component of the larger electronic cigarette." *It does not describe any special properties of this "cartridge" but rather indicates the cartridge's purpose is to contain a liquid formulation*.

7

8

9

Dkt. 88 at 11 (emphasis added). The Court's claim construction analysis should end here.

10

NJOY's admits that the claimed cartridge does not have any "special properties." Requiring

11

the cartridge to be "removable," as NJOY now proposes, is a special property. NJOY's

12

proposed construction is thus in direct conflict with the specification of the patent and must

13

be rejected.

14

For clarification, JLI is not asserting that the claimed cartridge must not, or cannot,

15

be removable within the context of the '533 patent. Rather, it is JLI's position that the

16

cartridge may or may not be removable in the context of different embodiments. In fact,

17

the '533 patent specification discloses cartridges that may ***not*** be removable. For example,

18

embodiment 445 discloses "[t]he cartridge of any one of embodiments 441-444, wherein

19

the cartridge is *separable* from the electronic cigarette." '533 patent at 54:4-7 (emphasis

20

added). Specifying that in *some* embodiments the cartridge is "separable," of course,

21

carries the inverse—namely, that in *other* embodiments the cartridge is ***not*** separable. The

22

specification further contemplates that "[i]n *some* embodiments the fluid storage

23

compartment 4 is *replaceable* as part of a *replaceable* cartridge." *Id.* at 17:29-32 (emphasis

24

added). Again, the specification clearly states that cartridges embodying the invention ***may***

25

be "replaceable" in *some* embodiments, but such an attribute is not inherent or required by

26

all of the cartridge embodiments described in the '533 patent.

27

28

7

1    This general understanding from the specification of the '533 patent is supported by

2  the various forms of electronic cigarettes that have evolved over time. In one style, such as

3  the JUUL system, the cartridge (the JUUL pod) is removable from the rest of the device.

4  In another style, such as a cigalike as exemplified by the NJOY Daily, the cartridge is not

5  removable. *See* Ex. 1 Ozga et al. NJOY's reliance on singular embodiments in the

6  specification is therefore misplaced and improper.  *Liebel-Flarsheim Co. v. Medrad, Inc*.,

7  358 F.3d 898, 913 (Fed. Cir. 2004) (noting that "it is improper to read limitations from a

8  preferred embodiment described in the specification—even if it is the only embodiment—

9  into the claims absent a clear indication in the intrinsic record that the patentee intended

10  the claims to be so limited."). Here, NJOY has not pointed to any part of the '533 patent

11  demonstrating an intent to disclaim the invention's use in all types of electronic cigarettes.

12  *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The claims,

13  not specification embodiments, define the scope of patent protection. The patentee is

14  entitled to the full scope of his claims, and [the Court] will not limit him to his preferred

15  embodiment or import a limitation from the specification into the claims.").

16    Unable to find what it wants in the patent's specification, NJOY turns to extrinsic

17  evidence. First, NJOY relies on general-use dictionaries, which are disfavored during claim

18  construction. *See Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311,

19  1321 (Fed. Cir. 2004) (holding that "where evidence -- such as expert testimony credited

20  by the factfinder, or technical dictionaries -- demonstrates that artisans would attach a

21  special meaning to a claim term, or, as here, would attach no meaning at all to that claim

22  term (independent of the specification), general-usage dictionaries are rendered irrelevant

23  with respect to that term; a general-usage dictionary cannot overcome credible art-specific

24  evidence of the meaning or lack of meaning of a claim term."); *Phillips*, 415 F.3d at 1318

25  (recognizing that "there is a virtually unbounded universe of potential extrinsic evidence

26  of some marginal relevance that could be brought to bear on any claim construction

27  question," and that "each party will naturally choose the pieces of extrinsic evidence most

28

PLAINTIFF'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

favorable to its cause, leaving the court with the considerable task of filtering the useful extrinsic evidence from the fluff.").

Second, NJOY's reliance on tobacco pipe patents from as early as 1964 and 1902 underscores how strained its argument is. ENDS products did not exist in 1964, and accordingly such patents do little to illuminate the state of the art at the time of invention and the meaning of terms to a POSITA. NJOY and Altria also ignore their own patents, cited on the face of the '533 patent, specifying that cartridges may or may not be removable. *See* US 2013/0,192,615 at [0027]; WO 2013/142,678 at [0004]. In contrast to the patents NJOY cites, these patents are contemporary with the time of the '533 patented invention, and they use the term "cartridge" as JLI construes it here.

Third, NJOY misrepresents and overstates the testimony of JLI inventor Adam Bowen. Mr. Bowen testified that "cartridges are ***sometimes*** used to describe … that component of a two-component system." Def. Br. Ex. 10 at 37:24-38:2 (emphasis added). But NJOY's brief conveniently omits the word "sometimes" when citing to this testimony. Dkt. 88 at 15. NJOY's other citations to Mr. Bowen's testimony are similarly excerpted and offered without necessary context. For example, NJOY ignores Mr. Bowen's testimony that "I know [the term "cartridge"] is used ***in a number of different ways***." Def. Br. Ex. 10 at 41:11-12 (emphasis added). The Court should be extremely cautious of relying on Mr. Bowen's testimony, taken out of context, for purposes of a claim construction exercise. *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008) ("We hold that inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction."). To the extent it is considered, however, Mr. Bowen's testimony actually supports JLI's construction that a cartridge may be removable in some embodiments and unremovable in others.

In sum, and consistent with its use both in the ENDS industry generally and in the '533 patent specifically, the term "cartridge" can be used to describe both "removable" (e.g, 2-piece) cartridges and integrated (e.g., 1-piece) cartridges. The specification contains no disclaimer limiting the invention to only "removable" cartridges, and instead uses

PLAINTIFF'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

removability as an optional quality of a cartridge. The Court should not import a limitation into the claims that is not supported by the plain language, the specification, and the overall intrinsic record.

**B.    "the salt is present in an amount that forms a nicotine concentration of 0.5% (w/w) to 20% (w/w) in the nicotine salt liquid formulation"**

If the claim term were simply "nicotine concentration," in isolation, JLI might agree with NJOY's proposed construction. However, in the context of the '533 patent claims, the words "nicotine concentration" are part of a much larger claim limitation, namely: "the *salt* is *present* in an *amount* that forms a nicotine concentration of 0.5% (w/w) to 20% (w/w) in the nicotine salt liquid formulation." This limitation requires the "presence" of a "salt" in a particular "amount." By its plain terms, it is not directed solely to a "nicotine concentration." The term is properly read as a having a noun ("the salt"), followed by an adjective that modifies the noun ("is present in an amount that forms a nicotine concentration of 0.5% (w/w) to 20% (w/w) in the nicotine salt liquid formulation"). NJOY's proposed construction seeks to address the adjective, but not the noun. Because NJOY's proposed construction impermissibly reads out the plain and ordinary meanings of other words in the full claim limitation, it should be rejected.

Having failed to present an objectively reasonable claim construction that accounts for the plain language of the claim, NJOY argues that JLI's proposed construction renders the claim indefinite. Not so. NJOY's argument that multiple measurement methods exist disregards the fact that *at the time of invention* (here, May 2013), only one method—the pH method in conjunction with the Henderson-Hasselbalch equation—was being used by artisans to quantify the ionized form of nicotine in different products. Even NJOY's expert report acknowledges that the NMR method for measuring nicotine protonation was developed only in 2018. Dkt. 89-11 at 37 (citing Duell et al. (2018)). Accordingly, that method cannot form the basis of an indefiniteness position against a patent with a priority date five years *prior* to anyone in the field even recognizing or using the technique. *See W.L. Gore & Assoc.*, 721 F.2d at 1556-57; *Honeywell*, 341 F.3d at 1336; *Cf. Dow Chem.*

PLAINTIFF'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

*Co. v. NOVA Chems. Corp. (Can.)*, 809 F.3d 1223, 1224 (Fed. Cir. 2015) ("[I]f a skilled person would choose an established method of measurement, that may be sufficient to defeat a claim of indefiniteness, even if that method is not set forth *in haec verba* in the patent itself.") (Prost, C.J., Dyk & Wallach, JJ., concurring in the denial of the petition for rehearing en banc).

The '533 patent further guides a POSITA to use the pH method. For example, the patent cites to WO 2016/071,705, titled "Solution comprising nicotine in unprotonated form and protonated form." Ex. 8. This patent application applies the Henderson-Hasselbach equation to calculate the relative fraction of protonated nicotine in solution. *Id.* at 9-10. Similarly, at least thirteen other references cited in the '533 patent discuss pH in their titles, in contrast to none discussing NMR. *See* '533 patent at References Cited. In other words, NJOY has not shown by clear and convincing evidence that the NMR method for measuring protonated nicotine was known or contemplated in the art at the time of invention. The intrinsic record of the patent refutes the extrinsic record proffered by NJOY.

If this Court were to consider NJOY's proffered expert report, it would be relying on evidence that is not only extrinsic to the patent, but also evidence that is both deficient and not credible. First, the expert report of Dr. Rogers is deficient because it references fifteen appendices, none of which are before the Court for consideration. *See* Dkt. 89-11 at 4. Indeed, all of Dr. Rogers' protocols and data are missing. The Federal Rules of Evidence require the proponent of expert testimony to demonstrate that the testimony is based on sufficient facts or data and the product of reliable principles and methods. Fed. R. Evid. 702. Putting aside whether the Court should attempt to make findings in this claim construction proceeding based on extrinsic evidence (it should not), the Court cannot make such findings without access to the actual data and methods that NJOY's purported expert proposes to rely on. Second, the expert report of Dr. Rogers is not credible because it presents an opinion that is the ***opposite*** of the opinion rendered by another of NJOY's paid experts in an IPR proceeding involving the very same '533 patent just a few months ago. *See* IPR2026-00161, Ex. 1009 at ¶ 47 (Dr. Byrn not mentioning the NMR method at all,

PLAINTIFF'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

and instead relying on pH and the Henderson-Hasselbalch equation to calculate protonated nicotine concentrations). Dr. Rogers' opinion should be accorded an evidentiary weight of zero.

In sum, the second claim term means exactly what it says: "the *salt* is ***present*** in an ***amount*** that forms a nicotine concentration of 0.5% (w/w) to 20% (w/w) in the nicotine salt liquid formulation." It is the salt that must be present. It is the salt that must be measured. NJOY's proposed construction disregards this plain meaning. As discussed above and further in JLI's opening brief, Dkt. 86, the claim, specification, and prosecution history all make clear that JLI's construction is correct.

## VI.    CONCLUSION

The two terms proposed by NJOY for construction are readily understandable to a person of ordinary skill in the art, and both should be construed to have their plain and ordinary meaning, without further modification or limitation.

Date: March 13, 2026                    Respectfully submitted,

**MINTZ, LEVIN, COHN, FERRIS,**
   **GLOVSKY AND POPEO, P.C.**

*/S/ Thomas H. Wintner*
Michael T. Renaud*
Adam S. Rizk*
Thomas H. Wintner*
Matthew C. Hurley*
Matthew A. Karambelas*
James J. Thomson*
Samuel J. Lyons*
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000

*Admitted Pro Hac Vice

**COPPERSMITH BROCKELMAN PLC**
Malvika A. Sinha
Kelleen Mull

*Counsel for Plaintiff*
*JUUL Labs, Inc.*

PLAINTIFF'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF